UNITED STATES of America, Appellee,

v.

Olga VALENCIA and William Suarez Valencia, Defendants–Appellants.

Nos. 726, 735, Dockets 79–1365, 79–1366.

United States Court of Appeals, Second Circuit.

Argued Feb. 13, 1980.

Decided Sept. 18, 1980.

F. Louis Caraballo, Brooklyn, N. Y., for defendant–appellant Olga Valencia.

David Seth Michaels, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant–appellant William Suarez Valencia.

Thomas G. Roth, Asst. U. S. Atty., for the Eastern District of New York, Brooklyn, N. Y., Edward R. Korman, U. S. Atty. for the Eastern District of New York, Harvey M. Stone, Asst. U. S. Atty. for the Eastern District of New York, Brooklyn, N. Y., for appellee.

Before OAKES and Van GRAAFEI-LAND, Circuit Judges, and TENNEY, District Judge.*

_____

* Of the Southern District of New York, sitting by designation.

OAKES, Circuit Judge:

This is an appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York, Eugene H. Nickerson, Judge, following a jury trial. Appellant William Valencia was acquitted on Count One of the indictment charging him with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, but convicted on Counts Two and Three charging him with distributing cocaine and possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Appellant Olga Valencia was convicted on all three counts, but at sentencing the Government moved to dismiss Count One as to her. Appellant William Valencia was sentenced to concurrent terms of three years' imprisonment with a special parole of five years. Appellant Olga Valencia was sentenced to a term of imprisonment of three years and six months with a special parole term of ten years.

Appellant William Valencia primarily argues that the trial court erred in improperly withdrawing a major part of his entrapment defense during jury deliberations. Because we agree with that argument, we reverse his conviction and remand for a new trial. Both appellants also claim that the warrantless search of their apartment violated their Fourth Amendment rights and that other portions of the district court's supplemental instructions on entrapment were erroneous. In addition, appellant Olga Valencia argues that the evidence at trial established that she was entrapped as a matter of law and that the court's modified *Allen* charge [1] was coercive. We disagree with these arguments and accordingly affirm Olga Valencia's conviction.

I. *FACTS*

On May 17, 1979, government informant Maria Palacio and undercover detective Jose Guzman, assigned to the New York Drug Enforcement Administration (DEA) Task Force, arrived at the apartment of appellants William and Olga Valencia in

1. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

Queens, New York. Olga let them into the apartment where William was sitting at the kitchen table. Palacio told the Valencias that Guzman had come to buy cocaine from them. When Guzman asked to examine the cocaine, Olga produced a triple–beam balance scale and two bags containing a white substance. Guzman told her that she need not weigh the cocaine because any discrepancy could be rectified in future purchases. The Valencias assured him that the cocaine was pure. After Guzman performed a test on the cocaine, there was a disagreement about the price. Olga sought to charge him $6,500 for the one–eighth of a kilogram involved, while Guzman countered with $6,300 because he claimed that the cocaine was not pure. According to Guzman's testimony, William interjected that they could not accept $6,300 because their profit margin would be too low. They finally settled on a price of $6,450. Guzman testified that he handed this sum to William and that William then handed it to Olga, stating that she could count it more quickly.

As the money was being counted, according to Guzman, William told Guzman that he "used to be in the business," but had to turn the duties over to Olga because he had been injured in an automobile accident. Before leaving, Guzman expressed interest in making additional purchases. Appellants told him that they would be able to supply as much "weight" as he wanted as long as they received one day's advance notice.

Five days later, Guzman went back to the apartment. There he talked with William and another person who was later identified as Arturo Arboleda. In response to a question from William, Guzman told him that the cocaine that he had purchased from them was not as pure as he had been led to believe. Olga was not home, but William urged Guzman to wait because Olga had some higher quality cocaine to sell him. Guzman left and returned in half an hour, but Olga still had not returned. Guzman then left without making any additional purchases.

Guzman next met with Olga on June 14, 1979, on a Queens street. He sought to buy additional cocaine, but she told him that she did not have any. According to Guzman, she told him that her "connection," Arboleda, had been arrested, but that she was attempting to find a new connection and knew one source of supply from which she could get a kilogram for $68,000. On June 20, the Valencias told Guzman at their apartment that they had found a new connection, but that he had failed to meet them at a prearranged time. When Olga failed to reach the connection after trying again, Guzman left.

The Valencias had advised Guzman that they were planning to move because they feared they were being followed by the police. Thus alerted, the DEA Task Force arrested the Valencias on June 21, 1979. Olga was arrested without a warrant on a street outside the Valencias' apartment. In response to a question from the officers, Olga told them that William was inside the apartment. They asked Olga if they could enter the apartment. She did not respond, but walked toward the apartment. The officers then followed her into the apartment without protest from her. Once inside the apartment, the officers arrested William, also without a warrant. One of the officers, Detective Robert Johnson, drew his gun just before entering, but Olga did not see it. Johnson then handed to Olga and William a card with *Miranda* warnings in Spanish. The Valencias indicated that they understood the warnings. According to the officers' testimony at a pretrial suppression hearing, which testimony Judge Nickerson found "wholly credible," Johnson asked Olga if the officers could search the apartment and she gave her consent, stating that she had "nothing to hide." Johnson then searched Olga's pocketbook, which was lying on the kitchen table within reach of Olga and William. Pieces of paper with narcotics–related writing were found in the pocketbook. A balance scale, strainer and spoon with traces of cocaine were found in a closet, and a bag containing a cocaine cutting substance, inositol, was found in the bedroom.

Olga's defense at trial was essentially entrapment. William relied on entrapment to some extent, although counsel for William also argued in summation that there was insufficient evidence to link William to the cocaine transactions at all.[2]

Maria Palacio, the government informant, was called to testify by William Valencia. She had agreed to cooperate with the DEA because her son had been arrested on a cocaine charge and she was trying to aid his case. Palacio testified that she first spoke to Olga in Elisa's Bar in Queens in May of 1979, when Olga approached her, although she had seen Olga in the bar before that time. According to Palacio, Olga told her that she needed money and Palacio expressed a similar need to Olga. Palacio testified that Olga then told her that she had cocaine to sell, but did not have any customers. They entered into an agreement, according to Palacio, whereby Palacio would find customers for Olga in exchange for a share of the proceeds. Palacio later testified that Olga was the first one to bring up the subject of drugs. Palacio then reported this conversation to the DEA authorities and agreed to introduce an undercover agent to Olga.

Palacio further testified that on the evening of May 16, 1979, the day before the sale to Guzman, she and Olga met a man, whom Olga described as her "connection," on a street corner in Queens. According to Palacio, Olga said the connection had left a sample of the cocaine at the Valencias' apartment. Palacio testified that they then drove to the apartment where they found a tinfoil packet of cocaine which had been left with William. Olga gave it to Palacio, who turned it over to Detective Johnson. Palacio indicated that she never spoke to William directly about cocaine.

Olga then took the stand in her own defense and testified that she had met Palacio at Elisa's Bar after she had begun to work there as a cleaning woman in February of 1979. Olga testified that she complained to Palacio about her need for money as a result of William's auto accident, and that Palacio responded that her son had been involved in selling cocaine and that they could make money by selling cocaine themselves to her son's former customers. Olga claimed that she initially resisted the idea, but that from February to May of 1979 Palacio was continually "pushing" and "coercing" her to enter into the cocaine selling plan. Olga testified that she finally capitulated because of her financial difficulties. Shortly after this, Olga testified, Palacio supplied her with the scale, the spoon, the strainer, and a small amount of cocaine.

It was Olga's testimony that on May 17, 1979, the day the cocaine was sold to Guzman, she received one–eighth of a kilogram of cocaine and the cutting substance at Elisa's Bar from someone she knew only as "Jose." She testified that Jose gave her the cocaine on credit even though they did not know each other well. Olga admitted selling the cocaine to Guzman, and admitted that the narcotics–related writing found in her pocketbook was hers. But she denied that William had any involvement with the sale of cocaine and disputed testimony by Detective Johnson that she had engaged in evasive driving tactics on one occasion as she and William were driving to Arboleda's apartment.

## II. INSTRUCTIONS

No objection was taken by defense counsel or is made here to the district court's initial instruction on entrapment noted in the margin.[3] Twice more, in response to jury requests, the court reread this original

2. Trial counsel for William Valencia took the position during closing argument that William "had nothing to do with" cocaine dealing. William's counsel further told the jury that entrapment was "not determinative" of William's case "because the government has yet to establish by any, any [sic] evidence to approach the reasonable doubt standard that my client had anything to do with cocaine, anything."

3. The district court's first entrapment instruction read as follows:

The defendants assert that they were victims of entrapment as to the offenses charged in the indictment. Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents, to commit a crime, he or she is a victim of entrapment, and the law forbids his or her convic-

entrapment charge. Upon a third request by the jury for elaboration upon the subject of entrapment, particularly with respect to "the degree of inducement by a Government agent which would constitute entrapment," the court delivered a modified and extended version of its previous charge, also set forth in the margin.[4] This charge was objected to by defense counsel on the grounds that it was one–sided and failed to mention reasonable doubt.

Shortly thereafter, the judge solicited counsel's views on whether or not the defendant William Valencia was entitled to the defense of entrapment at all because he had not been directly induced by a government agent but rather, if at all, by his codefendant Olga. After some argument on the issue, the court decided that it would not withdraw the entrapment defense entirely from William despite the fact that a portion of his defense was that he had

---

tion for that offense. But where a person already has the readiness and willingness to violate the law, the mere fact that police officers or their agents provide a favorable opportunity to commit the offense is not entrapment.

If, then, you find beyond a reasonable doubt from all the evidence that either or both the defendants were ready and willing to commit the crimes charged in the indictment before any acts occurred on the part of law enforcement officers or their agents, and that they did no more than offer the opportunity to commit the crimes, you should find that that defendant was not the victim of entrapment. On the other hand, if you have a reasonable doubt as to whether either of the defendants had the previous intent or purpose to commit the offenses charged apart from the inducement or persuasion of some officer or agent of the Government, then you must find that defendant not guilty.

4. This first supplemental charge on entrapment stated:

We start with the proposition that where a person has no previous intent or purpose to violate the law, and Government agents come along, and that would include Miss Palacio, come along, and they induce or persuade a defendant to commit a crime, something they had no purpose at all to engage in. Then that would be entrapment. That defendant would be entrapped.

Now, where someone, who, is ready and willing to violate the law, not necessarily to sell that particular amount of cocaine, but is ready and willing to violate the law and make sales of cocaine, the mere fact that Miss Palacio comes along and provides them with an opportunity to sell that, if you find that to be the fact, that would not be entrapment.

In other words, the test is whether they are ready and willing–whether a defendant is ready and willing to commit a crime, not necessarily this particular bit of cocaine, but ready and willing to commit an offense of the nature–such as that charge is–or had the previous intent to commit it–then that wouldn't be entrapment.

The Government doesn't have to prove, for example, that a defendant, if the Government

had never heard of these defendants, would have set in motion events which would have resulted in the unlawful distribution of this particular cocaine.

All right? And, of course, it is not entrapment for a Government agent, such as Detective Guzman, merely to pretend that he was someone else and to offer to purchase the cocaine. That mere fact wouldn't be entrapment.

Now, in determining whether or not a defendant was ready and willing to commit a crime such as that charged or had the previous intent to do so, you must consider all of the evidence, and you may consider, for example, whether or not the–a defendant made a ready response to the opportunity that was offered. You may consider whether or not a defendant showed any hesitancy in taking advantage or of grasping the opportunity that was offered. That is all for your determination.

I think I told you this. That it is a permissible–it is a permissible stratagem, so to speak, for the Government agents or someone on behalf of the Government, to offer to buy narcotics from someone who already has the intent or is ready and willing to sell it. Of course, if they have no intention of being in that business, no intention of committing those crimes, and the inducement comes to them–this is the thing that originates it in their minds–Is that the Government comes along and induces them or persuades them to do it–then that would be entrapment. In other words, the Government has to show to you–if you find that they were induced by Mrs. Palacio, the Government would have to satisfy you that they haven't, so to speak, seduced an innocent person, but that the inducement which brought about the offense that was charged which another which is another instance of the kind of conduct which a defendant was prepared to engage in, if they were offered the opportunity of engaging in that kind of conduct.

I think I have covered it. Bear in mind, the balance of my instructions with respect to every element of the case, the burden of proof and so forth.

nothing to do with the transaction. The court instead permitted the jury to consider whether or not William was entrapped directly by Guzman or Palacio at some point, but instructed the jury that William could not be indirectly entrapped through communications from Olga. That supplementary instruction is also set forth in the margin.[5] Counsel for William then objected to the charge on the grounds that the jury had not requested it and that it was inconsistent with the court's prior instructions. Ten minutes later, the jury returned with its verdict finding William not guilty on the conspiracy count but guilty on the other two counts. At the same time, the jury stated that it was "deadlocked on whether Olga was a victim of entrapment." The next day the court gave the jury a modified *Allen* charge and further explanation of the

entrapment principle, which is also set forth in the margin.[6] There is no indication that defense counsel objected to either. Thereafter, the jury returned with yet another note, which read:

According to the law does the willingness and readiness of a person to commit an unlawful act have to be present before any initiation by a government agent—or does the fact that a person was willing and ready to commit an unlawful act without hesitation when the suggestion was made by the agent determine whether entrapment exists?

The court's response to this question was not objected to by counsel and is set forth in the margin.[7] The jury returned fifteen minutes later with a verdict of guilty as to Olga on all three counts.

5. The district court gave the following charge to the jury on the scope of the entrapment defense available to William Valencia:

[W]hatever entrapment there is, if you find that there was any under the instructions that I have given you, if you find, beyond a reasonable doubt, there was the element which I charged you, the entrapment would have to take place by a Government employee or agent. Miss Palacio would be an agent. In other words, if one of the defendants was entrapped, if you make that assumption, and then went and induced another defendant to become involved, that that [*sic*] second one wouldn't be entitled to the defense of entrapment. The entrapment, in other words, if there is any, would have to come from a Government agent. Under the testimony here[,] [f]or example, if you find that under the charge that I gave you that Mrs. Valencia was entrapped by Mrs. Palacio and then that Mrs. Valencia then went and got her husband involved, assuming you were to find that, Mr. Valencia couldn't be entrapped by his wife.
. . .

6. The district court gave the following third supplemental charge on entrapment:

Now, in the first place, you say that you are deadlocked on whether Mrs. Valencia was a victim .of entrapment which precludes reaching a verdict. I think I have been through the elements of entrapment. There are really two questions in it. One, whether Mrs. Valencia was induced to commit the offense that is charged in the indictment, and secondly, if so, if she was induced, was she ready and willing and awaiting an opportunity to commit an offense, and on that issue of whether she was ready and willing and had the intent to commit an offense like that

charged in the indictment, the government has the burden of proof—of proving that beyond a reasonable doubt, and I won't repeat to you all of my charge on that, on the burden that the government has, and the presumption of innocence. You heard that on several occasions.

7. The court answered the jury's question as follows:

I don't think those are true alternatives that you stated in your question, so let me see if I can clarify what I think you may have in mind. If I'm wrong you will write me another note.

Now, if a defendant has a propensity to possess and distribute drugs in the fashion that is charged here, that is, if the defendant was ready and willing to commit that kind of crime, then the mere fact that the government offers an opportunity to .commit the crime is not entrapment.

So that they have to have beforehand that propensity, that willingness and readiness in the event that an opportunity is offered. That has to be present—obviously it has to be present before that opportunity is offered.

Now, I think what you are asking in the latter part of your question is what sort of evidence you should consider in determining whether the defendant had a propensity or readiness and willingness, and the answer to that is you should consider all the evidence in the case. In determining the answer you may of course consider whether the defendant hesitated, and if so to what extent the defendant hesitated in grasping the opportunity. But you should also consider all of the evidence in the case.

## III. DISCUSSION

We dispose of appellants' meritless contentions first.

A. *The warrantless entry into and search of appellants' apartment.* Appellants claim that the evidence seized during the warrantless entry into and search of their apartment should have been suppressed because it was seized in violation of the Fourth Amendment. This evidence included the narcotics–related writing, the triple–beam balance scale, the strainer, the spoon, and the cocaine cutting substance. Appellants had stipulated that on June 21, 1979, the date of their arrest, police officers from the DEA Task Force had probable cause to arrest them.

Despite Olga's testimony that she never consented to a search of the apartment, the district court denied appellants' suppression motion. The court found that following Olga's arrest she consented to the entry by the officers into the apartment and that even if she had not there were exigent circumstances which permitted entry. The court further found that the items obtained in the apartment were seized pursuant to a valid consent, and that the seizure of the narcotics–related writings was incident to the lawful arrest of William.

 There is no reason to disturb the district court's findings that Olga voluntarily consented to the entry into and search of the apartment. Whether consent is voluntarily given is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). In order to establish a valid consent, it need not be shown that there has been a knowing and intelligent waiver of the right to refuse consent, unlike the situation in *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), which required such an explicit waiver before a defendant could be found to have relinquished rights designed "to preserve a fair trial." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 237, 93 S.Ct. at 2053. The Court in *Schneckloth* held such a strict standard inapplicable to waivers of

Fourth Amendment rights because those rights do not affect the fairness of the trial. *Id.* at 241, 93 S.Ct. at 2055. Nor does the decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), "require[ ] the conclusion that knowledge of a right to refuse is an indispensable element of a valid consent." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 246, 93 S.Ct. at 2058. Since no showing is thus required that Olga knew of her right to refuse consent or that she intelligently waived that right, the district court's findings that she voluntarily consented to the entry and search must be upheld unless it is clear from the evidence either that she was coerced or that the court's finding of consent was clearly erroneous.

 There is no evidence that the DEA agents coerced Olga into letting them enter the apartment. When they asked if they could enter, Olga walked toward the apartment and opened the door for them with a set of keys. She did not protest their entry in any way. There was no coercion other than that inherently arising from the fact of her arrest, which is itself insufficient to demonstrate that the consent was coerced. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). While Detective Johnson drew his gun just before Olga opened the apartment door, Olga testified that she never saw Johnson draw the gun.

Similarly, there is no reason to dispute the district court's finding that Olga gave her voluntary consent to a search of the apartment. Although Olga testified at the suppression hearing that she never gave such consent, the district judge found her testimony on this score "wholly incredible" and the agents' testimony "wholly credible." Nothing in the record indicates that the district court erred in evaluating the testimony in this fashion, or that Olga was in any way coerced into consenting to the search.

 Finally, the search of Olga's pocketbook containing the narcotics–related writing can also be justified as incidental to a

lawful arrest, irrespective of Olga's consent to search. The pocketbook was on the table within reach of both William and Olga, and an arresting officer is entitled to search belongings in "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

■ B. *The charge as a whole.* Leaving aside momentarily the question of the instruction that removed most of the entrapment defense from William Valencia, the rest of the court's charge contained no reversible error. The court's initial instruction on entrapment, note 3 *supra,* conformed with this court's recommendations in *United States v. Martinez–Carcano,* 557 F.2d 966, 970 (2d Cir. 1977), and *United States v. Braver,* 450 F.2d 799, 805 (2d Cir. 1971), *cert. denied,* 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972). As this court suggested in those cases, nowhere in the charge did the district court refer to any "burden" or "burden of proof" imposed on defendants to establish government inducement as a prerequisite to claiming entrapment. In response to notes from the jury, the court twice reread this charge, which appellants have never challenged.

■ Appellants contend that the court's first supplemental instruction, note 4 *supra,* failed to correct a possible misunderstanding on the part of the jury that defendants were required initially to prove inducement beyond a reasonable doubt before entrapment could be found. This instruction was given in response to a jury request for elaboration on "the degree of inducement by a Government agent which would constitute entrapment" and for "the definition of inducement." The court once again declined to allocate the burden of proof on the inducement question and focused instead on whether defendants had the propensity to commit the offense. If the court had followed the course now suggested by appellants and had instructed the jury on "the burden and level of proof required to show inducement," it once again would have run afoul of the principles set

out by this court in *Martinez–Carcano, supra,* and *Braver, supra.* Under those cases, the district court should not instruct the jury that there is any burden at all on defendants to prove inducement. There is little risk that the jury will impose too great a burden on defendants if no burden is mentioned at all. Indeed, if anything, the district court's initial and first supplemental instructions here were generous to defendants since there instructions emphasized the question of propensity—a question that is only reached when there is sufficient evidence of inducement.

■ Appellants further challenge this first supplemental instruction on the ground that it failed to reiterate the requirement that the Government prove propensity beyond a reasonable doubt. At the conclusion of this instruction, however, the court explicitly stated: "Bear in mind, the balance of my instructions with respect to every element of the case, the burden of proof and so forth." This referred the jury back to the initial charge where the Government's burden of proof was properly set out.

■ Appellants also argue that the district judge, in the same instruction in which he discussed William Valencia's entrapment defense, note 5 *supra,* confused the jury by implying that defendants were obligated to prove inducement beyond a reasonable doubt. The portion of the charge objected to reads:

> [W]hatever entrapment there is, if you find that there was under the instructions that I have given you, *if you find, beyond a reasonable doubt, there was the element which I charged you,* the entrapment would have to take place by a government employee or agent.

(Emphasis added.) To the extent that there is any arguable confusion in this charge, it is insignificant when the entire charge is read in context. And a subsequent instruction, note 6 *supra,* corrected any misimpression that may have been left.

■ Appellant Olga further claims that the court improperly failed to clarify the

meaning of the term "hesitation" in its final supplemental charge on entrapment, note 7 supra, but counsel did not object, the term has a common, readily understandable meaning, and there was no need for further clarification. Several other passages which appellants argue were confusing to the jury are also insignificant given the' correctness of the charge as a whole.

█ The modified *Allen* charge, given after about a day and a half of deliberations, was practically identical to that approved by this court in *United States v. Corcione*, 592 F.2d 111, 117 (2d Cir.), *cert. denied*, 440 U.S. 975, 985, 99 S.Ct. 1545, 1801, 59 L.Ed.2d 794, 60 L.Ed.2d 248 (1979). Appellant Olga seeks to distinguish this case from *Corcione* on the following grounds: (1) that there was a large heroin smuggling operation in *Corcione* while this case involved only one sale of one–eighth of a kilogram of cocaine; (2) that the trial judge in *Corcione* asked the jury to decide for itself if further deliberations would be productive, while in this case the jury was told to deliberate further; (3) that in *Corcione* the jury deliberated for four additional hours after the charge, while here they deliberated only a little over an hour; and (4) that in the present case the jury had already previously convicted the codefendant, whereas in *Corcione* there had been no convictions when the *Allen* charge was given. These distinctions are insubstantial and do not make the charge given here any more coercive than that in *Corcione*. The district court made it clear to the jurors that they were not to surrender any conscientiously held views. *See United States v. Robinson*, 560 F.2d 507, 517 (2d Cir. 1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

C. *Entrapment as a matter of law.* Appellant Olga argues that the Government failed as a matter of law to prove that she was ready, willing and able to commit the crimes charged, *i. e.*, that she had a propensity to sell cocaine, once defendants had introduced evidence of inducement. She contends that the sole evidence of predisposition in the record was Detective Guzman's testimony that she had a familiarity with terms and expressions related to narcotics. But even if the jury found that Olga was induced by Palacio, there was still sufficient evidence, viewed in the light most favorable to the Government, for the jury to find that Olga had the propensity to commit the offense and hence was not entrapped.

█ Once evidence of inducement has been introduced, the Government may prove the propensity of the defendant to commit an offense by showing:

(1) an existing course of criminal conduct similar to the crime for which he is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement.

*United States v. Viviano*, 437 F.2d 295, 299 (2d Cir.), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971). There is evidence in the record to support all three of these elements of propensity.

█ Maria Palacio testified that Olga told her that she had cocaine to sell but needed customers. There was evidence that the Valencias had a readily available source of supply for cocaine, Arturo Arboleda. The fact that Olga was able to get a substantial amount of cocaine on credit from Jose at Elisa's Bar would support an inference that Olga had dealt in cocaine on prior occasions. Moreover, Detective Johnson's testimony about Olga's evasive driving maneuvers and Detective Guzman's testimony as to the Valencias' knowledge of the quality and price of the cocaine might lead a jury to believe that the Valencias were somewhat experienced with cocaine transactions. The jury could also have relied on Guzman's testimony that William told him that he used to be in the drug business and Guzman's additional testimony that the Valencias told him they could supply him with as much cocaine as he could handle. All of this evidence could support a jury finding either that the Valencias had been engaged in a similar "course of criminal conduct," or had already formed the design to sell cocaine and were merely looking for a buyer.

In addition, even if the jury found that Olga had not intended to sell cocaine until her contact with Palacio, there was evidence that Olga made a "ready response to the inducement" by agreeing with Palacio's plan when first proposed. While Olga testified to the contrary that she resisted the idea for some time, the jury was entitled to discredit that testimony. *See United States v. Ordner*, 554 F.2d 24, 28–29 (2d Cir.), *cert. denied*, 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977).

 D. *William's defense of entrapment.* The most troubling question in the case relates to William Valencia's entrapment defense and the supplementary charge, note 5 *supra*. It was the judge's thought, and is the Government's position on appeal, that because a defendant cannot be entrapped unless he has had actual contact with a government agent who directly induced him to commit the offense, William was not entitled to have the defense of entrapment through indirect inducement go to the jury.[8] We cannot agree with this view. If a person is brought into a criminal scheme after being informed indirectly of conduct or statements by a government agent which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly.

Our reading of *United States v. Swiderski*, 539 F.2d 854, 858–59 (2d Cir. 1976), is to this effect.[9] The Government argued in that case that since codefendant De Los Santos was not exposed to constant conversations with the government informant, her willpower could not have been broken down. *Id.* at 858. Thus the Government asserted that there never was any inducement of De Los Santos, who had been brought into the illegal activity by her fiance, Swiderski, who in turn had been in contact with the government agent. *Id.* at 859. This court rejected that argument and held that De Los Santos was entitled to an entrapment instruction, noting that, since De Los Santos was Swiderski's "fiancee and apparently his constant companion," there was a "fair inference that he told her of the importuning by [the informant], if that, in fact, happened." *Id.* In the present case, there was more than simply the close marital relationship between William and Olga. Olga's testimony revealed that after the inducement to her and prior to the sale underlying the May 17, 1979 sale, Palacio, the allegedly inducing government informant, had made frequent visits to William's and Olga's apartment, which William was unable to leave because of his injuries, during which time Palacio was continually "pushing" and "coercing" Olga to sell cocaine. It also appeared, from Palacio's testimony, that William was aware that a sale was in progress the night before it took place. From all these circumstances the inference might readily be drawn that the inducement had been communicated to William.[10] In general, we hold that a vicarious

---

**8.** As mentioned previously, the district court did not remove from the jury's consideration the question of whether William might have been entrapped through any *direct* contact with either Detective Guzman or Maria Palacio.

**9.** *See also United States v. Buie*, 407 F.2d 905, 908 (2d Cir.), *aff'd on other grounds sub nom. Minor v. United States*, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969); *Johnson v. United States*, 115 U.S.App.D.C. 63, 317 F.2d 127, 128 (1963).

**10.** A more troublesome problem is whether a defendant may raise an indirect entrapment defense when an intermediary brings him into a scheme that was generated by a government agent, but where the defendant is not made aware of any importuning by that agent or has not been introduced to that agent. In other words, if A is a government agent who induces B and B gets C involved, and if C has no knowledge of the inducement of B by A or has never been introduced to A, can C nevertheless argue entrapment on the ground that he would not have become involved *but for* the original inducement by A?

We need not decide this question in this case because, based on the circumstances of this case, it may be proven that William knew of any inducement by Palacio and hence may have been influenced by it. Moreover, William was introduced to Palacio and hence knew of her involvement. We further note that in *Buie*, note 9, *supra*, and *Johnson*, note 9, *supra*, the defendants who sought to plead indirect entrapment were eventually introduced to the

entrapment defense can be presented to a jury only where the defendant first introduces admissible evidence that the agent's inducement was directly communicated to him by another. In this case, however, we remand for a determination by the trial judge whether there was sufficient evidence of direct communication between Olga and William to permit the question of inducement of William to go to the jury. If there was not, the conviction should be affirmed. If there was, William should be given a new trial.

In *Swiderski*, the alleged inducement of De Los Santos took place not only through an invitation by the informant to have Swiderski attend a "party," an invitation which was conveyed to De Los Santos by Swiderski, but also through the "fear" instilled in both of them by the informant when he sought to sell them cocaine. The Government seeks to distinguish *Swiderski* by the fact that De Los Santos was physically present with the informant when some of the purported inducement occurred. But the court explicitly said: "[T]he inducement . . . *was the luring of appellants to a room for a party and* the subsequent instilling of

fear by the government informer." *Id.* at 859 (emphasis added). Accordingly, the distinction is unavailing. The *Swiderski* court clearly contemplated that the invitation could be considered part of the inducement of De Los Santos even though it was communicated to her by her fiance and not directly by a government agent. Indeed, the argument in favor of William here is stronger than it was for De Los Santos since here the indirect inducement allegedly caused William to engage in actual criminal activity, as opposed to merely causing a defendant to appear at a scene where criminal activity was to take place.[11]

It is apparent that William could invoke the entrapment defense based on communications from Olga despite the fact that the jury found that Olga had not been entrapped. If there is sufficient evidence of inducement by a government agent to permit the case to go to the jury, then the question of entrapment turns on the individual propensity of each defendant who may have been induced. Thus, the jury might well have convicted Olga because it found that she had the propensity to commit the offense. That does not mean, how-

---

government agents who allegedly provided the inducement, although it is unclear whether those defendants were told of the alleged inducement before becoming involved in the criminal activity. Accordingly, this case is distinguishable from those cases which have held that an indirect entrapment defense is unavailable where the defendant has had no contact with the government agent and where there is no indication that the alleged inducement by the agent has been related to the defendant through the intermediary. *See Crisp v. United States*, 262 F.2d 68, 69 (4th Cir. 1958); *United States v. Dodson*, 481 F.2d 656, 658 n.3 (5th Cir. 1973); *United States v. Gonzales*, 461 F.2d 1000, 1001 (9th Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 230, 34 L.Ed.2d 175 (1972).

11. Our dissenting brother appears to recognize the rule that entrapment may occur as the result of conduct by third-party agents of the government as well as by government officials. Quoting *Lopez v. United States*, 373 U.S. 427, 434, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963), the dissent states that entrapment "deals with the manufacturing of crime by 'law enforcement officials and their agents.'" From our own circuit the dissent cites the case analyzed above of *United States v. Buie*, note 9 *supra*, in which the court, approving a charge that en-

trapment "must be done by a government official or somebody acting under his orders and directions," 407 F.2d at 908 n.5, said, "[w]hile the entrapment defense does not extend to inducement by private citizens . . . *the defense is available, of course, where government agents act through private citizens.*" 407 F.2d at 908 (emphasis added). Cases from other circuits cited by the dissent recognizing the agency principle as shown by the dissent's own quotations include *United States v. Laverick*, 348 F.2d 708, 713 (3rd Cir.), *cert. denied*, 382 U.S. 940, 86 S.Ct. 391, 15 L.Ed.2d 350 (1965); *United States v. Thompson*, 366 F.2d 167, 173–76 (6th Cir.), *cert. denied*, 385 U.S. 973, 87 S.Ct. 512, 17 L.Ed.2d 436 (1966); *United States v. Mayo*, 498 F.2d 713, 716 (D.C. Cir. 1974).

The dissent does not address what we think is the closer question, whether the third-party agent may be unwitting, perhaps because that question was answered affirmatively in *Johnson v. United States*, note 9 *supra*, which in turn was cited with approval not only in its own circuit, *United States v. Mayo, supra*, 498 F.2d at 716 nn. 5 & 6, but in our own, *United States v. Buie, supra*, 407 F.2d at 908. *See* note 10 *supra*.

ever, that the jury would necessarily find that William also had such a propensity.

The Government has another string in its bow, however, in that it argues that the defense of entrapment should not be available to a defendant who completely denies participation in the criminal acts alleged. The court in *Swiderski* reserved this question. 539 F.2d at 859 & n.4. As *Swiderski* pointed out, two cases in this circuit, *United States v. Pagano*, 207 F.2d 884, 885 (2d Cir. 1953) (per curiam), and *United States v. Di Donna*, 276 F.2d 956 (2d Cir. 1960) (per curiam), have held that it was not error for a trial judge to refuse to charge entrapment where the defendant denied knowledge of participation in any criminal activity. In *United States v. Bishop*, 367 F.2d 806, 809 (2d Cir. 1966), however, this court said that there was no need to decide whether a defendant's denial of "the acts alleged to constitute a crime foreclosed the defense of entrapment." *Bishop* took note of *Pagano* and *Di Donna*, and implicitly called those cases into question. *Id.* at 809

n.4. Subsequent cases in this circuit have treated this as an open question. *See United States v. Alford*, 373 F.2d 508, 509 (2d Cir.), *cert. denied*, 387 U.S. 937, 87 S.Ct. 2063, 18 L.Ed.2d 1003 (1967); *United States v. Braver, supra*, 450 F.2d at 802 n.7; *United States v. Licursi*, 525 F.2d 1164, 1169 n.5 (2d Cir. 1975); *United States v. Swiderski, supra*, 539 F.2d at 859 & n.4; *United States v. Brown*, 544 F.2d 1155, 1159 (2d Cir. 1976). *But see id.* at 1162 (Bartels, J., concurring).

The other circuits are both literally and figuratively spread all over the map on this question. Indeed, several circuits have either modified or completely changed their positions during the last decade. The First, Third, Seventh, and Tenth Circuits have never permitted a defendant to raise inconsistent defenses,[12] while the District of Columbia and Fourth Circuits have consistently permitted such defenses.[13] The Ninth Circuit used to prohibit inconsistent defenses, but now permits them.[14] The Sixth Circuit has gone in the opposite direction, since it used to allow them, but now appar-

12. The First Circuit has noted "the settled principle that a defendant's testimony to the effect that he did not commit the crime cannot raise an issue of entrapment." *Sylvia v. United States*, 312 F.2d 145, 147 (1st Cir.), *cert. denied*, 374 U.S. 809, 83 S.Ct. 1694, 10 L.Ed.2d 1032 (1963). More recently it has stated: "Under the law of this Circuit it is clear that the issue of entrapment does not arise until a defendant *admits* commission of the crime charged but asserts that the offense was instigated by the actions of the law-enforcement officers." *United States v. Caron*, 588 F.2d 851, 852 n.4 (1st Cir. 1978) (emphasis added). The Third Circuit has also held that a defendant who "did not admit the crime charged . . . was not entitled to any entrapment instruction." *United States v. Watson*, 489 F.2d 504, 507 (3d Cir. 1973). *See United States v. Shoup*, 608 F.2d 950, 964 (3d Cir. 1979); *United States v. Levin*, 606 F.2d 47, 48 (3d Cir. 1979) (per curiam). The rule in the Seventh Circuit is otherwise that "absent admission of the act an instruction on entrapment will not be submitted to the jury." *United States v. Johnston*, 426 F.2d 112, 114 (7th Cir. 1970). *See Burris v. United States*, 430 F.2d 399, 403 (7th Cir. 1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 909, 27 L.Ed.2d 824 (1971). The Tenth Circuit has adopted a similar rule "that an accused cannot raise the defense of entrapment unless he admits to the commission of the crime charged." *United States v. Gibson*, 446 F.2d 719, 722 (10th Cir. 1971). *See Martinez v. United States*, 373 F.2d 810, 811–12 (10th Cir.

1967). But that court has slightly modified its rule by stating "that testimony from an accused is not prerequisite to his reliance upon the defense of entrapment." *United States v. Worth*, 505 F.2d 1206, 1209 (10th Cir.), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975). Thus, an affirmative admission by a defendant is apparently not required in that circuit so long as he has not actually denied the acts alleged.

13. In *Hansford v. United States*, 303 F.2d 219, 221 (D.C. Cir. 1962) (en banc), an opinion in which Chief Justice (then Judge) Burger joined, the District of Columbia Circuit said that "[i]t was consistent with defendant's denial of the transaction to urge that if the jury believed it did occur the government's evidence as to how it occurred indicated entrapment." *See United States v. Neuman*, 436 F.2d 285, 286 n.1 (D.C. Cir. 1970) (per curiam), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971). The Fourth Circuit in *Crisp v. United States, supra* n.10, 262 F.2d at 70, similarly held that it was "perfectly proper to allow a criminal defendant to submit to a jury [the] alternative defenses" of denial of guilt (of a narcotics sale) and entrapment.

14. The Ninth Circuit in *United States v. Demma*, 523 F.2d 981, 985 (9th Cir. 1975) (en banc), overruling a line of cases beginning with *Eastman v. United States*, 212 F.2d 320 (9th Cir.

ently prohibits them.[15] The Fifth Circuit generally does not permit inconsistent defenses, but has created several exceptions and has begun to question the propriety of the general ban.[16] Finally, the Eighth Circuit like the Second leaves the question

1954), per Judge Hufstedler, held "that a defendant may both deny the acts and other elements necessary to constitute the crime charged and at the same time claim entrapment." The court noted that the former rule against inconsistent defenses in the context of entrapment was "without any justification." *Id.*

15. In *Scriber v. United States*, 4 F.2d 97, 98 (6th Cir. 1925), the Sixth Circuit explained: "A jury might conclude that defendant's claim of good intent was untrue . . . , but might also conclude that he had been by the government officers unduly persuaded and influenced into the crime and thus ought not to be held guilty." Citing *Scriber* with approval, the same court held in *United States v. Baker*, 373 F.2d 28, 30 (6th Cir. 1967), that a defendant was not precluded from raising an entrapment defense even though he testified that he did not know that the box of pills he sold to a government agent contained morphine. In *United States v. Shameia*, 464 F.2d 629, 631 (6th Cir.), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 684, 34 L.Ed.2d 664 (1972), however, the Sixth Circuit held "that the defendant may not absolutely deny every act necessary to constitute the offense and then claim entrapment on the part of the Government agents." *Shameia* did not mention *Scriber* and sought to limit *Baker* to the situation in which the defendant at least admitted the acts bringing him into contact with the agent. *Id.* at 630–31. Even this last vestige of the *Scriber* and *Baker* rules vanished, however, in *United States v. Mitchell*, 514 F.2d 758 (6th Cir.), *cert. denied*, 423 U.S. 847, 96 S.Ct. 86, 46 L.Ed.2d 68 (1975). In *Mitchell*, the defendant admitted receiving money from a government agent, but denied guilty intent in a fashion similar to the defendants in *Scriber* and *Baker*. The Sixth Circuit, citing neither of those cases, held that "the district judge properly precluded appellant from relying on the defense of entrapment." *Id.* at 761. Indeed, *Mitchell* cited with approval *United States v. Barrios*, 457 F.2d 680 (9th Cir. 1972), which is squarely contrary to *Baker* on this issue. *Id.*

16. In *Henderson v. United States*, 237 F.2d 169, 173 (5th Cir. 1956), that court established a test that some inconsistency in defenses was permissible as long as "[t]he two defenses do not seem to us so repugnant that proof of one necessarily disproves the other." Thus, the court held that the defendant was entitled to an entrapment instruction where he admitted committing overt acts in furtherance of a conspiracy, but denied knowledge of the conspiracy. This reasoning was elaborated in *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965),

where the defendant denied not only knowledge of the conspiracy, but also the very acts which allegedly made him a part of the conspiracy; it was held that he was entitled to an entrapment charge since he did not introduce contradictory evidence of entrapment himself, but instead relied on the Government's evidence that there was entrapment. *Id.* at 143. Later cases have, however, limited *Sears* to the situation in which a defendant *admits* committing the overt acts alleged, but denies participation in a conspiracy, as in *Henderson, supra*. *United States v. Pickle*, 424 F.2d 528, 528 (5th Cir. 1970); *McCarty v. United States*, 379 F.2d 285, 286–87 (5th Cir.), *cert. denied*, 389 U.S. 929, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967); *Beatty v. United States*, 377 F.2d 181, 186 & n.9 (5th Cir.), *rev'd on other grounds*, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967). Later cases have also restricted a defendant's right to raise inconsistent defenses even further by stating that a defendant could only argue entrapment in a conspiracy case if he admitted a *culpable* overt act, not one that was merely innocent. *United States v. O'Leary*, 529 F.2d 1202, 1203 (5th Cir. 1976) (per curiam); *United States v. Newcomb*, 488 F.2d 190, 192 (5th Cir.) (per curiam), *cert. denied*, 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1972). Another case has stated that *Sears* creates an exception limited "to the situation where the Government's own case in chief injects substantial evidence to support a theory of entrapment." *United States v. Morrow*, 537 F.2d 120, 138–39 (5th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). *See also United States v. Newcomb, supra*, 488 F.2d at 191–92. One case has permitted an entrapment defense where a defendant does not admit participation in the acts, as long as he had not actually taken the stand to deny the acts so that "no evidence inconsistent with the defense of entrapment was introduced." *United States v. Groessel*, 440 F.2d 602, 605 (5th Cir.), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971). More recently, *United States v. Greenfield*, 554 F.2d 179 (5th Cir. 1977), added another exception that a defendant could raise entrapment if he admitted the physical acts alleged, but argued that he lacked criminal intent. *Id.* at 182–83. Finally, *United States v. Daniels*, 572 F.2d 535, 542 (5th Cir. 1978), questioned the continued validity of the general rule "that a defendant can raise the entrapment defense only if he admits commission of the underlying offense." The court noted that "[t]his theory *justifiably* has been attacked by this court and by other courts." *Id.* (emphasis added). The court did not abandon that rule, however, choosing instead to bring the case within the

undecided despite earlier cases indicating inconsistent defenses were impermissible.[17]

■ In this situation, where the circuits appear to be in conflict, our own cases are not altogether consistent, and the Supreme Court cases do not address the question,[18] we hold that William Valencia, having put the Government on notice in counsel's opening statement of the assertion of the dual defenses of entrapment and non-involvement, is entitled to raise the defense of entrapment since he did not take the stand to deny personally his participation in the transaction and did not affirmatively introduce any other evidence that he was not involved. Although William's counsel in summation articulated his client's position that William was in no way involved in the sale of cocaine and although counsel's examination of Olga was only to elicit the response from her that William never had anything at all to do with cocaine, that is insufficient to withdraw the entrapment defense from William.

■ In reaching this conclusion, we need go no further than the Fifth Circuit in making the entrapment defense available to a defendant who, having duly notified the Government of the assertions of dual defenses, chooses not to testify and does not introduce any evidence inconsistent with the defense of entrapment.[19] *See United States v. Groessel,* 440 F.2d 602, 605 (5th Cir.), *cert. denied,* 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971). *See also United States v. Demma,* 523 F.2d 981, 984 (9th Cir. 1975) (en banc). We therefore need not decide whether we would follow the District of Columbia, Fourth, and Ninth Circuits in making the entrapment defense available to a defendant who actually testifies that he did not participate in the alleged criminal activity or uses alibi witnesses to make the same point.

Judgment affirmed as to Olga Valencia; reversed and remanded as to William Valencia.

VAN GRAAFEILAND, Circuit Judge (concurring in part and dissenting in part):

The defense of entrapment is generally said to be based upon either estoppel or public policy. *Sorrells v. United States,* 287 U.S. 435, 457, 53 S.Ct. 210, 218 (1932). These concepts can only be called into play when someone has acted at the instigation or behest of the Government in inducing the defendant to commit the crime with which he is charged. My colleagues now propose to make the defense available to defendants whom the Government never sought to entice but who were influenced secondhand by a person to whom alone the Government's inducements were directed. In so holding, the majority have rejected a rule of law that has received the approval of every court hearing criminal appeals in the federal system.

The Supreme Court has expressed the rule very simply. Entrapment, the Court says, deals with the manufacturing of crime by "law enforcement officials and their agents," *Lopez v. United States,* 373 U.S. 427, 434, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963), with the performance of an illegal

---

exception that "the government's own evidence raised the issue of entrapment." *Id.*

**17.** *Compare Kibby v. United States,* 372 F.2d 598, 601 (8th Cir.), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2055, 18 L.Ed.2d 993 (1967) (question undecided), *with Ware v. United States,* 259 F.2d 442, 445 (8th Cir. 1958) (denial precludes defense).

**18.** *See United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

**19.** Since an entrapment defense still cannot be raised without some evidence of inducement by a government agent, a defendant who wishes to argue entrapment will often, as a practical matter, still have to admit participation in the criminal activity notwithstanding the rule that we have announced. *See United States v. Demma,* note 14 *supra,* 523 F.2d at 985. Here, however, William was fortunate because his codefendant, Olga, furnished the necessary evidence of inducement so that he himself did not have to provide such evidence and thereby admit his involvement in the transaction. By trying the defendants jointly, the Government took its chances that this would occur.

act "at the instance of governmental officials," *Sorrells v. United States, supra,* 287 U.S. at 451, 53 S.Ct. at 216. According to the Court, "[e]ntrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law enforcement officials." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958) (*quoting Sorrells v. United States, supra,* 287 U.S. at 451, 53 S.Ct. at 216) (emphasis by *Sherman* Court). The Court has recognized as a standard entrapment instruction a charge that the jury should acquit if it had "a reasonable doubt whether the defendant had the previous intent or purpose to commit the offense ... and did so only because he was induced or persuaded by some officer or agent of the government." *United States v. Russell,* 411 U.S. 423, 427 n.4, 93 S.Ct. 1637, 1640, n.4, 36 L.Ed.2d 366 (1973).

The substance of this standard instruction was given on three occasions by the court below without objection from defense counsel. However, because both defendants were asserting an entrapment defense, the court also charged over defense objection that if one of the defendants (Mrs. Valencia) was entrapped and then went out and induced another defendant (Mr. Valencia) to become involved, the second defendant (Mr. Valencia) would not be entitled to the defense of entrapment.[1] The majority hold this to be error, stating that "[i]f a person is brought into a criminal scheme after being informed by an intermediary of conduct or statements by a government agent which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly." Because I do not believe that the majority correctly state the law of the Second Circuit or of any other Circuit, I dissent.

The leading case in this Circuit on the subject of entrapment is *United States v. Sherman,* 200 F.2d 880, 882–83 (2d Cir. 1952). There, Judge Learned Hand described the issues of an entrapment claim in language that this Court still follows:

"(1) did [a government] agent induce the accused to commit the offense charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense. On the first question the accused has the burden; on the second the prosecution has it." *Id.* (*as quoted in United States v. Barnes,* 604 F.2d 121, 160 (2d Cir. 1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).)

As Judge Hand interpreted the meaning of inducement, "it was that someone employed for the purpose by the prosecution had induced the accused to commit the offence charged, which he would not have otherwise committed." *United States v. Sherman, supra,* 200 F.2d at 882.

In subsequent decisions, this Court has followed in Judge Hand's footsteps. In *United States v. Romano,* 278 F.2d 202, 204 (2d Cir. 1960), we said that "in order to sustain the defense of entrapment it must appear that the government or someone acting for the government was the initiator of the defendant's illegal acts in the sense of having induced the defendant to do what the defendant would otherwise not have been willing to do."

In *United States v. DeAlesandro,* 361 F.2d 694, 698 (2d Cir.), *cert. denied,* 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966), where the alleged inducer was "neither a law enforcement official nor an agent of law enforcement officials", we again held the defense of entrapment to be inapplicable. Quoting *United States v. Romano, supra,* we said that "[t]he primary reason for the defense of entrapment is that 'it is unthinkable that the government should prosecute those whom it has urged to commit [the] crime.'" 361 F.2d at 698.

---

1. Counsel for William Valencia did not argue in either opening or summation that William had been entrapped by Maria Palacio, the Government informer. His contention, a weak one at best, was that William was entrapped on May 17, 1979 by Government agent Guzman, who deliberately handed William the money for the drugs that were being purchased from Mrs. Valencia.

In *United States v. Buie*, 407 F.2d 905, 908 & n.5 (2d Cir. 1969), *aff'd*, 396 U.S. 87, 89 S.Ct. 284, 24 L.Ed.2d 283 (1969), we said that entrapment does not arise from inducement by private citizens and approved a charge which stated that entrapment "must come from the government" and "must be done by a government official or somebody acting under his orders and direction."

In *United States v. Reed*, 526 F.2d 740, 743 (2d Cir. 1975), *cert. denied*, 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976), we cited with approval the Ninth Circuit case of *United States v. Sanchez*, 440 F.2d 649 (9th Cir. 1971), and held that "since the invitation to participate came, not from the Government but from appellant's co–conspirator, there was no question of fact on the issue of inducement."

It is extremely unlikely that Judges Friendly, Mulligan, and Gurfein, the able and experienced panel in *United States v. Swiderski*, 539 F.2d 854 (2d Cir. 1976), would have agreed among themselves to overturn the established doctrine of the above–cited cases without so much as a passing reference to the cases themselves. The fact of the matter is that they reached no such agreement, and they were not required by the evidence to do so. The thrust of the defense in *Swiderski* was that both Swiderski and his codefendant, Mariza De Los Santos were enticed or lured to an apartment by the Government informer for the purpose of "turning on" or "snorting" cocaine and were there forced to buy a quantity of cocaine for fear of bodily harm. Judge Gurfein, writing for the Court, said that if Mariza was induced to aid in the purchase of cocaine, "the inducement, on her testimony, was the luring of appellants to a room for a party and the subsequent instilling of fear by the government informer." *Id.* at 859. A reading of appellants' briefs in *Swiderski* makes crystal clear their own contention that the inducement which brought De Los Santos to the apartment came directly from the Government inform-er and that the cocaine came into her possession as a result of coercion exercised by the informer.

Assuming in the instant case that the informer was a Government agent, it is undisputed that there were no conversations between Mr. Valencia and the informer prior to the purchase of cocaine.[2] It is also undisputed that Mrs. Valencia at no time acted in cooperation with the Government or under the Government's direction and control for the purpose of getting her husband involved. She was not "employed for the purpose by the prosecution", *United States v. Sherman, supra*, 200 F.2d at 882, and she conveyed no information to Mr. Valencia, wittingly or unwittingly, at the government's behest. Indeed, both the informer and Mrs. Valencia testified that Mr. Valencia did not get involved in the cocaine transaction and had nothing at all to do with it.

The burden was on William Valencia to show that the Government induced him to participate in the illegal transaction. *United States v. Braver*, 450 F.2d 799, 801–03 (2d Cir. 1971), *cert. denied*, 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972). My brothers' inference of a conversation between Mr. and Mrs. Valencia falls far short of satisfying this burden, particularly where there is no showing that the inferred conversation took place at the behest of the Government. In short, Mr. Valencia was not entrapped by the Government informer and, as the trial court charged, "[he] couldn't be entrapped by his wife." A review of the law in other circuits shows this to be the universally accepted rule.

*United States v. Sanchez, supra*, 440 F.2d 649, cited by this Court in *United States v. Reed, supra*, 526 F.2d at 743, is only one of a series of Ninth Circuit cases holding that "a defendant may not seek shelter under the defense of entrapment claimed by another." *See United States v. Gonzales*, 461 F.2d 1000, 1001 (9th Cir.) (per curiam), *cert. denied*, 409 U.S. 914, 93 S.Ct. 230, 34

---

**2.** The informer testified as follows:

 Q: Did you speak to William Valencia before there was a purchase of cocaine?

 A: No. He didn't get involved in anything. He didn't say anything at all.

L.Ed.2d 175 (1972). This rule is based sometimes upon the defendant's lack of standing to raise the issue, *United States v. Castanon*, 453 F.2d 932, 934 n.1·(9th Cir.), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1788, 32 L.Ed.2d 122 (1972), and sometimes upon the failure of the evidence to establish the elements of estoppel against the Government. *Carbajal–Portillo v. United States*, 396 F.2d 944, 946–48 (9th Cir. 1968). Pertinent citations from other circuits· are as follows:

*Whiting v. United States*, 321 F.2d 72, 76 (1st Cir.), *cert. denied*, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963):

"If the inducement had come from parties having no connection with the government it would absolve him in no degree."

*United States v. Laverick*, 348 F.2d 708, 713 (3d Cir.), *cert. denied*, 382 U.S. 940, 89 S.Ct. 391, 15 L.Ed.2d 350 (1965):

"It is obvious that a private individual may only be an entrapping party when an agency relationship exists between himself and the Government."

*United States v. Perl*, 584 F.2d 1316, 1322 n.5 (4th Cir. 1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979):

"[Entrapment] requires a showing that the government and the entrapper have an established relationship such that the government is estopped from denying responsibility for the entrapment."

*United States v. Garcia*, 546 F.2d 613, 615 (5th Cir.), *cert. denied*, 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977):

"Entrapment cannot result from the inducements of a private citizen but must be the product of conduct by governmental agents."

*United States v. Thompson*, 366 F.2d 167, 173–76 (6th Cir.), *cert. denied*, 385 U.S. 973, 87 S.Ct. 512, 17 L.Ed.2d 436 (1966):

"'Unlawful entrapment can only exist where a law enforcement officer or an agent of the government suggests or induces or persuades a person to commit an offense. An agent of the government may include, of course, any person acting upon the instructions or directions of any law enforcement officers of the United States.'"

*United States v. Perkins*, 190 F.2d 49, 52–53 (7th Cir. 1951):

"As we understand his contention, Perkins says that Riley was first entrapped and hence the entire transaction was vitiated *ab initio*, and that the defense of entrapment is likewise available to him. The mere statement of the proposition condemns it ...."

*Beard v. United States*, 59 F.2d 940, 941 (8th Cir. 1932):

"It is not entrapment that one has been induced by some other than a person acting for the government to commit a crime ...."

*Holloway v. United States*, 432 F.2d 775, 776 (10th Cir. 1970):

"Before the defense can fairly be said to have been presented, there must be some showing of conduct by government agents which may well have induced the accused to commit the crime charged."

*United States v. Mayo*, 498 F.2d 713, 716 (D.C.Cir.1974):

"It is fundamental that a defense based on entrapment requires the 'inducement by an official .... The entrapment defense does not extend to inducement by a private citizen ....' If, however, a Government official uses a private citizen as an agent, and in such manner induces an otherwise unwilling person to commit an offense which that person would not have committed but for the inducement, then the defense will lie. (Footnotes omitted).[3]"

I have gone into this issue in some detail because I am convinced that the majority have delivered an unwarranted, yet resounding, blow to law enforcement efforts. If their "pass it along" concept of inducement is now to become the law of this Circuit, claims of entrapment will shortly

---

**3.** *See also* section 2.13 of The American Law Institute's Model Penal Code, which provides that entrapment may be·perpetrated only by a "public law enforcement official or a person acting in cooperation with such an official ...."

be forthcoming from individuals the government never knew existed. Moreover, because of the problems facing the government in proving what has transpired between co–conspirators, claims of second-hand or derivative entrapment will be hard to defend against. In reversing William Valencia's conviction, the majority have made bad law. I therefore dissent from that reversal.

Because there was no error in the trial court's charge on entrapment, it was unnecessary for the majority to reach out and decide the issue of inconsistent defenses. Because my colleagues have seen fit to do so, I have no recourse but to add my own brief comments.

I think the case will be rare in which a defendant denies committing the crime with which he is charged but asserts that if he did commit it he was entrapped into doing so. However, if a defendant is to be permitted to rely on these inconsistent defenses, he should make clear his intention to do so. He should not be permitted to claim only lack of involvement and then, after the proofs are closed, ask for a charge on entrapment. Where entrapment is claimed, the Government has the burden of proving the defendant's predisposition to commit the crime. Proof of prior and subsequent criminal conduct is admissible, and often indispensable, for this purpose. *United States v. Warren*, 453 F.2d 738, 745 (2d Cir.), *cert. denied*, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972); *United States v. Koska*, 443 F.2d 1167, 1169 (2d Cir.) (per curiam), *cert. denied*, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971). Defense counsel should not be allowed to maneuver the Government out of introducing whatever proof it has on the issue of defendant's predisposition. *United States v. Bishop*, 367 F.2d 806, 809–10 (2d Cir. 1966).

I concur in affirming the judgment as to Olga Valencia but dissent in reversing the judgment as to William Valencia.

VAN GRAAFEILAND, Circuit Judge (dissenting from denial of en banc):

The doctrine of *stare decisis* is not "an imprisonment of reason" but "neither is it a whimsy." *United States v. International Boxing Club of New York, Inc.*, 348 U.S. 236, 249, 75 S.Ct. 259, 266, 99 L.Ed. 290 (1955) (Frankfurter, J., dissenting). "Very weighty considerations underlie the principle that courts should not lightly overrule past decisions." *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339 (1970).

It is these considerations, perhaps, that have given rise to the commonly accepted doctrine that one Court of Appeals panel cannot overrule the decision of a prior panel but that such disregard of *stare decisis* requires action by an en banc court. *See, e. g., Ingram v. Kumar*, 585 F.2d 566, 568 (2d Cir. 1978), *cert. denied*, 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Timmreck v. United States*, 577 F.2d 372, 376 n.15 (6th Cir. 1978), *rev'd on other grounds*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979); *Doe v. Charleston Area Medical Center, Inc.*, 529 F.2d 638, 642 (4th Cir. 1975); *United States v. Jenson*, 450 F.2d 1258, 1264 (9th Cir. 1971), *cert. denied*, 405 U.S. 1043, 92 S.Ct. 1326, 31 L.Ed.2d 584 (1972). Courts which espouse this doctrine usually state that panels have no authority to overrule prior panels. *See United States v. Fatico*, 603 F.2d 1053, 1058 (2d Cir. 1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980); *Doraiswamy v. Secretary of Labor*, 555 F.2d 832, 847 n.119 (D.C.Cir.1976); *Davis v. Estelle*, 529 F.2d 437, 441 (5th Cir. 1976). However, this is somewhat of an overstatement. The doctrine of *stare decisis* is a moral obligation, *People ex rel. Rice v. Graves*, 242 App.Div. 128, 135, 273 N.Y.S. 582 (1934), *aff'd*, 270 N.Y. 498, 200 N.E. 288 (1936); it is not a rule of compulsion.

Although it is unusual for one panel to acknowledge that it is overruling another, *but see North Carolina Utilities Commission v. F.C.C.*, 552 F.2d 1036, 1044–45 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977), a panel may overturn precedent implicitly by simply ignoring it. Alternatively, the panel may mislabel bind-

ing precedent as dictum. Finally, and this is the most invidious alternative, the panel may misinterpret the holding of a prior panel. When a panel misconstrues what a prior panel has said, the misconstruing panel unfairly shifts the responsibility for what may be an erroneous legal concept to the shoulders of other judges. In addition, the panel is able to change the course of the law without setting forth any rationale in support of the change. I fear that this is what occurred in this case.

Rule 35(a) of the Federal Rules of Appellate Procedure provides for en banc consideration when it is necessary to secure or maintain uniformity in the decisions of the court. Because the decision of Judge Oakes, concurred in by District Judge Tenney, is at odds with prior decisions of this Court, I believe this case merits such en banc review. The failure of the necessary majority of my colleagues to agree prompts this dissent.

When the writer stated in his panel dissent that the panel majority did not correctly state the law of the Second Circuit or of any other Circuit, he was not expressing only his own opinion. Professor Roger Park, writing on entrapment in the *Minnesota Law Review*, says that federal courts "have universally declined to permit the defense to be raised in cases where an 'entrapment' was accomplished by a private person rather than a government agent." Park, *The Entrapment Controversy*, 60 Minn.L.Rev. 163, 240 (1976). The Senate Judiciary Committee, which has opted in the proposed Revised Criminal Code to base the defense of entrapment upon the "principles of the common law", *see* S.1722, 96th Cong., 1st Sess. § 501 (1979), prepared a summary of what it considered that law to be. It said:

A comparison of the competing views of the entrapment defense as they have emerged in the *Sorrells, Sherman*, and

*Russell* line of cases reveals a considerable area of common ground occupied by the respective rationales. Under either theory, for example, entrapment may result only from governmental inducement; inducement to wrongdoing by a private person does not establish the defense....

\* \* \* \* \* \*

As previously indicated, a basic element of the defense of entrapment is that the [defendant] be induced by the government. Inducement by a private party cannot form the basis for an entrapment defense. However, the entrapper need not be an official in the legal sense. It is sufficient if an agency relationship exists, such as with an informant, even if officials are not aware of the details of the informant's activities.

Senate Comm. on the Judiciary, Criminal Code Reform Act of 1977, S.Rep.No.605, 95th Cong., 1st Sess. 117–18 (1977).[1]

The federal courts do not stand alone in requiring that entrapment be the act of the Government. Those states which have made entrapment a statutory defense uniformly provide that the inducement must come from a Government officer or his agent, *see, e. g.*, Ga.Code Ann. § 26–905 (1978); Mont.Rev.Codes Ann. 45–2–213 (1979), a person acting "in cooperation" with the officer, *see, e. g.*, Ark.Stat.Ann. § 41–209 (1977); Conn.Gen.Stat.Ann. § 53a–15 (West 1972); Del.Code tit. 11, § 432 (1974); Haw.Rev.Stat. § 702–237 (1976); N.H.Rev.Stat.Ann. § 626:5 (1974); N.Y.Penal Law § 40.05 (McKinney 1975); N.D.Cent.Code § 12.1–05–11 (1976); 18 Pa. Cons.Stat.Ann. § 313 (Purdon 1973), or a person acting "under the direction" of the officer, *see, e. g.*, Colo.Rev.Stat. § 18–1–709 (1978); Utah Code Ann. § 76–2–303 (1978); Wash.Rev.Code Ann. § 9A.16.070(1) (1977).

There are several good reasons for this private-person exception to the entrapment

---

1. In 1971, the United States National Commission on Reform of Federal Laws provided at section 702(2)(e) of its Proposed New Federal Criminal Code that "entrapment occurs when a law enforcement agent induces the commission of an offense, using persuasion or other means likely to cause normally law-abiding persons to commit the offense." *See also* 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 13.09 (3d ed. 1977) and U.S. District Judges Association (5th Cir.), Committee on Pattern Jury Instructions, Criminal § 5 (1979).

rule. First, there is the "great danger of collusion and false claims" that would prevail in the absence of the exception. Park, *supra*, 60 Minn.L.Rev. at 241. Second, where, as in the instant case, the inducement is claimed to have come from a confederate of the defendant, the Government's burden of proving the defendant's willingness to accede to his confederate's promptings would in many cases be insurmountable. Finally, while arguably the lofty purpose of deterring improper police conduct and preserving respect for the criminal justice system may be served by acquitting defendants entrapped by Government agents, the same purpose would not be served by setting guilty men free who were never even in the agents' gunsights. *Id.* at 242–43.

When a prior panel of this Court decided *United States v. Reed*, 526 F.2d 740 (2d Cir. 1975), *cert. denied*, 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976), it opted squarely for adherence to the traditional rule requiring that the Government have effected the inducement. In *Reed*, two DEA agents met with an unindicted co-conspirator of the defendant to negotiate the purchase of some cocaine. The co-conspirator made a telephone call to a "Gerry", who said that he could sell the agents a quarter kilogram of cocaine and would meet them at the co-conspirator's apartment. After Gerry met with the agents, he called his "source", who agreed to meet Gerry and the agents at a designated location. The "source" turned out to be Reed, who later was arrested.

One of Reed's arguments on appeal was that the district court had erred in refusing to charge the jury on entrapment. In response to this contention, the Government argued that the defendant could not "establish inducement from the fact that his involvement may have arisen from the actions of a co-conspirator, even though that co-conspirator may have been responding to the inducement of a Government agent or informant." (Government Brief at 24.) That is precisely the issue involved in the instant case. Our holding in *Reed* that "since the invitation to participate came, not from the Government but from appellant's co-conspirator, there was no question of fact on the issue of inducement", 526 F.2d at 743, would seem to be dispositive of the issues presented here.

The panel majority disposed of *Reed* by ignoring it. They then misconstrued *United States v. Swiderski*, 539 F.2d 854 (2d Cir. 1976), in a manner which, to the best of the writer's knowledge, is not concurred in by any other member of this Court, including the surviving members of the *Swiderski* panel. Our district court judges are now left with the task of deciding whether *Reed* and the similar pronouncements of this Court in *United States v. Steinberg*, 551 F.2d 510, 513–14 (2d Cir. 1977),[2] *United States v. Braver*, 450 F.2d 799, 801 n.4 (2d Cir. 1971), *cert. denied*, 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972),[3] *United States v. Buie*, 407 F.2d 905, 908 n.5 (2d Cir.), *aff'd* 396 U.S. 87, 89 S.Ct. 284, 24 L.Ed.2d 283 (1969), *United States v. DeAlesandro*, 361 F.2d 694, 698 (2d Cir.), *cert. denied*, 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966), *United States v. Romano*, 278 F.2d 202, 204 (2d Cir. 1960), *United States v. Sherman*, 200 F.2d 880, 882–83 (2d Cir. 1952), still correctly state the law of this Circuit, or whether trial judges henceforth must charge the novel concept of "third-party agency" which seems to have been adopted by the panel majority herein. I believe our district judges deserve some help from this Court, if only to have it explain what a "third-party agent" is.

Our failure to give this matter en banc consideration cannot be justified by the unimportance of the issue involved. A computer search conducted by Professor Park

---

**2.** "The defense of entrapment is designed to protect innocent peoples from being convicted for crimes that government agents have unfairly tricked or persuaded them into committing." 551 F.2d at 513.

**3.** "The question of entrapment involves two issues. The first issue is whether the defendant was led or induced to commit the crime by anyone acting for the government." 450 F.2d at 801 n.4.

disclosed that for the years 1970 through 1974 there were 405 reported federal entrapment decisions, 65% of which involved drug offenses. 60 Minn.L.Rev. at 230. The cry "I was entrapped," heard with "mounting frequency" when *United States v. Dehar*, 388 F.2d 430, 432 (2d Cir. 1968) was written, continues to be heard with equal frequency today. *See* 18 West's Federal Practice Digest 2d *Criminal Law* §§ 37(1) to 37(8) (Pocket Part 1980). It is common knowledge that most drug cases involve the use of informer-solicitors. *See United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), Park, *supra*, 60 Minn.L.Rev. at 231. If the panel opinion is now the law of this Circuit, a DEA agent who hereafter solicits the sale of drugs by one person may find to his surprise that he has entrapped a nationwide group of conspirators. If an informant pays a bribe or kickback to one office-holder, the Government may be charged with entrapping everyone who gets a "piece of the action", even though the informant never heard of them.

I am thankful that my panel colleagues have reconsidered their original holding to the extent that they have deleted the doctrine of "inferred" inducement which they originally espoused. However, in remanding for findings by the district court, they have adhered to the proposition that Olga's conversations with her husband may be treated as an inducement by the United States Government. In the absence of any showing that Olga was acting at the instigation or behest of the Government, I respectfully submit that this is not, and should not be, the law.

I regret that a majority of my colleagues do not consider the matter of sufficient moment to warrant their consideration.